Thank you, I'd like to go ahead and take 14 minutes for the initial argument and reserve 6 for rebuttal. That's fine. May it please the Court, my name is Jack YETIV and I represent the petitioners in this case. Petitioners contend that the HUD ALJ's imposition of $70,000 in civil money penalties against them violate Section 706 of the Administrative Procedures Act, which of course controls agency actions such as the action of HUD here. HUD ALJ's decision to assess those penalties violated Section 706 because the action was arbitrary and capricious, not based on reason, and because it was not based on substantial evidence. Those are two requirements, of course, of Section 706. Now, it is clear, and there's no dispute, that Congress has established a statutory scheme that HUD is supposed to follow, which HUD did not follow, that HUD is supposed to follow in order to determine whether civil money penalties are appropriate. That statutory scheme is really quite simple in principle. It requires three things. First, the HUD ALJ must find substantial evidence for a violation of the regulatory agreement. The regulatory agreement in this case was signed between Trimie Corporation, one of the two petitioners, and HUD at the time that the loan was put into place on July 1st of 1997. However, a violation is not sufficient. What about a statute? Is it just the regulatory agreement? Or what if a statute is violated? Can they inflict a penalty for that? The statute just basically implements Clause 9e of the regulatory agreement, so the statute doesn't really say anything different than the regulatory agreement. I suppose the regulatory agreement can incorporate statutory requirements by reference. It could, and interestingly, it doesn't. The regulatory agreement incorporates nothing else, and in fact, Clause 15 of the regulatory agreement, and I may not be able to quote it exactly, says something along the lines of petitioners, in this case, owners is what the language is, shall not enter into any other agreement in violation of the provisions herewith, and in any case, this agreement shall supersede any conditions or provisions in conflict therewith. That's Clause 15, I believe, on page 4 of the regulatory agreement. So by its own language, the regulatory is clear that, you know, by the four corners rule integration, however you want to refer to it, the regulatory agreement is clear, at least it was when the petitioner signed it in 1997, that it is the supreme law that controls the relationship of the parties. Now, continuing on, as I mentioned, the congressional scheme requires three things to be found. A violation, as we mentioned, in this case, the violation alleged is of Clause 9E, the failure to file financial reports. But second, Congress required, and there's a lot of legislative language and floor debate actually in the supplemental appendix filed by HUD itself that talks about the importance of not assessing civil money penalties for trivial violations. The language on the floor by Senators Cranston and Kerry was that it should be a serious violation. The purpose of this is to deter fraud against HUD. We should be careful not to assess civil money penalties for trivial violations because doing so will interfere with HUD's mandate of encouraging the private sector to generate more housing. And incidentally, let me make a point here. This was not a subsidized loan. Neither petitioner has ever taken a dollar of subsidy, and one of the issues in the case is the potential for default, and the evidence in this case is undisputed that the petitioner, Tryman Corporation, paid $90,317 into a fund to handle any default. So even if there had been a default, and in this case, the facts are absolutely clear that no default was either considered or possible given the loan-to-value ratio of 30%, but it was absolutely clear that there was not going to be a default in this case. And so, therefore, the floor debate, congressional floor debate, which the Court obviously can look at to determine to the extent that it's unclear, to determine what congressional intent was. The third condition, in addition to finding a violation – sorry. The second condition, in addition to finding a violation, is finding that the violation was knowing. And again, the floor debate explained that inadvertent violations are not sufficient, regardless of their nature. The third congressional requirement was materiality. Now, because of the limit of time, I can't discuss all three of them in detail, but I think materiality is perhaps the most important one because it is in that area that the HUD ALJ committed his gravest errors, and it is further made important by the fact that every HUD C&P decision that I've read follows exactly the same faulty application of congressional intent. Now, let me get to that. It's clear that Congress has established that in order to find a violation, materiality has to be found. But in order to assess, once a violation is found, the amount of penalty, Congress actually has established eight factors, which have become among us known as the eight factors. Now, in implementing the congressional statute, HUD's regulations did something really weird. And I don't say it because I say it. But HUD ALJ in this case and in every other case, they've all commented that this makes no sense. I agree with them. The problem is after stating that it makes no sense, all the HUD ALJs implement this nonsensical scheme. And the first problem is that they use now, pursuant to the Secretary of HUD order, they use the same eight factors to determine materiality, i.e. to determine if a violation has occurred, a violation for which C&Ps ought to be levied has occurred. And then they reuse the exact same eight factors to determine the amount of the penalty. So that's the first problem. HUD ALJ in this case said that didn't make any sense. The administrative procedure supports it. It's not at all uncommon when it's the fashion among courts also to have eight or ten factors. And often some of them don't make sense because they always cut one way or something like that. But you could still take those and apply those parts of it that made sense and come out with a result. You might say, well, this one doesn't make much sense in this case, so we don't give it a particular weight, but this other one does, and so on. Well, Judge Kempe, you must know where my second statement is going to be. In fact, when we look at the individual factors themselves, HUD ALJ in this case stated that one of those eight factors was unconstitutional, which is factor number three, the ability to pay. And I quote Judge Hines in this case. He said to consider the ability to pay would unquestionably violate the Equal Protection Clause of the 14th Amendment. Yet he pursues the analysis and holds that factor against the petitioners after stating it's unconstitutional. Now, in addition to that factor of the eight. I don't know that I agree with him. We often have district judges deciding whether or not a fine will be paid on the basis of whether the person has any money or not. I think perhaps there is a confusion here, and perhaps it's mine. I agree with the court that if we're thinking about sentencing guidelines, it's appropriate to use ability to pay just like we do for punitive damages to determine the amount. What about a civil penalty, the amount of a civil penalty? I would agree. I would agree it's not unconstitutional to determine the amount. But recall, Your Honor, that the first analysis using ability to pay is in determining materiality. And without materiality, you can't have a violation to begin with. So they're using ability to pay to determine, in essence, guilt or innocence or liability or no liability. So it is in that area that that factor doesn't — is unconstitutional. Now, in addition to one of the eight factors being unconstitutional, Judge Hines, in this case, said that five additional ones, in addition to the one, are illogical. For example, we're trying to determine materiality, whether the violation is material. And Judge Hines said that to consider deterrence, for example, would not be a measure of materiality because deterrence is a societal purpose for future actions, and materiality is a backward-looking analysis that looks at the conduct of the parties. In any case, the — so that's the second problem. The second problem being that six of the eight factors, according to this judge in this case, in his own words, were illogical or unconstitutional. Yet he goes and considers and holds several of those factors against the Petitioners in this case. The third problem with HUD's regulatory scheme that violates the congressional intent is that HUD has decided, through its own rulemaking, that the standard by which these eight factors ought to be looked at to determine materiality shall be the totality of the circumstances standard. Now, I don't need to tell this distinguished court what that means. We all know what the totality of the circumstances means. But what the Secretary of HUD has further said, after losing on a case in front of a HUD ALJ twice, the Secretary of HUD kept changing the standard until they could convert a loss into a win. And in the third go-around in this case called the Associate Trust Case, which I believe I've included at tab 16 in my appendix, the Secretary of HUD said, you know what, although we've told you that you need to look at the totality of the circumstances, we don't really mean it. One factor is sufficient to find liability. So that's the third problem, is they establish a standard called the totality of the circumstances, and then in implementing it, they completely disregard that standard. The fourth problem, which really exacerbates problem number three, is that two of the factors can be found in every case without any evidence at all, much less substantial evidence. Those two factors are imagined injury to the public, even though the statute says injury to the public. The HUD ALJ in this case converted that to potential injury to the public. That can always be found. And the second factor that can always be found without any evidence is deterrence. Now, if you could find two of the factors and all you need is one to find materiality, and if those two factors can always be found, as they were in this case, without one scintilla of evidence, what we have essentially done, what HUD has essentially done, is written out the materiality requirement in the statute and the materiality requirement which was extensively discussed in floor debate and converted what is supposed to be the totality of the circumstances with three requirements, violation, knowing, and materiality, into a strict liability standard where simply proving that a violation occurred allows them to then prove materiality by arguing, well, there could have been some damage to the public, or... To back away from the minutiae, it seems to me the ultimate issue in this case is whether it's reasonable for HUD to impose a penalty for failure to file audited financial reports. Is there a reason why they can sensibly require audited financial reports? Well, I think that raises a separate question. Clause 90 doesn't require audited financial reports. It's clear. It does not require audited financial reports. Well, a combination of the agreement and the statute and the regulations did. Okay. That would be true only if you assume that a statute passed five years after that agreement, which is supposed to supersede any provisions in conflict therewith. That is if you assume, and obviously the court gets to decide this, but I don't see it proper for HUD by rulemaking five years after entering into an agreement with Trimie Corporation and thousands of other mortgagors to be able to do that without even letting the mortgagor know. I would also point out, Judge Canby, that there is a requirement, an independent requirement, which we didn't discuss much, for knowing conduct. There's absolutely no evidence in this case that Trimie Corporation and even less evidence, less than nothing evidence, that Jackie Teague, myself in my personal capacity, ever had a clue that HUD would at a later time think that it would get a personal guarantee from me and from every other principal of every other mortgagor entity that signed a regulatory agreement with HUD that HUD would five years after the signing be able to extract personal guarantees from people who weren't even signatories to the agreement. I see I only have five and a half minutes. I'd like to reserve that for rebuttal if I could. Thank you. Thank you. Thank you. Good morning, Your Honors. My name is Greg Addington. I'm an assistant U.S. attorney for the District of Nevada in Reno, and I represent HUD in this matter. I'm going to refer to both Yativ and Trimie, the corporate entity, as Yativ, unless context requires a specific reference, just for ease of reference. The operative statute describes how judicial review is obtained of a HUD in position of a civil monetary penalty, and that statute contemplates that an original proceeding be filed before the appropriate court of appeals seeking review based on the administrative record and based on the standard of review under the Administrative Procedures Act. Here, that wasn't done. Rather, a complaint was filed in the district court in Nevada, which requested review of HUD's imposition of the penalty, but also included other what I'll characterize as miscellaneous claims. The district court dismissed those miscellaneous claims and then transferred the remaining matter, the review of the civil monetary penalty claim, to this court. Yativ does not argue that the district court erred in any way in the dismissal of those remaining claims. And so through that procedural mechanism, I believe the case is properly here, as though it had been filed as a timely petition for review based on the administrative record that was submitted, as if it were a timely petition for review. As Mr. Yativ mentioned, the APA standard, obviously, is well known to this court. Is there an adequate factual basis for the penalty that was imposed not only on Mr. Yativ personally, but on the corporate entity that he wholly owned and controlled as the sole officer and director? We benefit, I believe, from a well-reasoned and comprehensive ALJ decision. Not just one, but actually two, and those are found at tab 11 in the excerpts of record. One decision, the preliminary decision, one decision that's actually titled initial decision, but that's actually the second decision. But the initial, the first decision, found that violations had indeed occurred and rejected various claims, arguments that were advanced by Mr. Yativ and Trinet. And then the second decision, which is actually the first in order in tab 11, assesses the amount of the penalty and likewise rejects other arguments advanced by Yativ and Trinet. So we benefit from that reasoning that's reflected in the ALJ's decision. The factual findings made by the ALJ are supported by references by the ALJ to the administrative record that's before the court, and so we benefit from that as well. What does the record reflect about whether HUD really wanted these statements at all? I mean, they never asked for them for five years or something like that. Well, that was a contention before the ALJ, and the ALJ didn't actually rule one way or the other. There's a footnote number four in the initial decision, or I should say the first decision, that's found at excerpts of record page 74, where the ALJ notes that there was conflicting testimony about whether HUD bothered Mr. Yativ over the course of the years requesting these audit reports. Mr. Yativ denied it, and then the ALJ simply noted that that was a point of contention but did note that it rejected Yativ's contention that HUD was indifferent to these reports. But I want to zero in on that question, Your Honor, because I think implicit the subtext here is that somehow these reports are simply a bureaucratic exercise. Nobody cares about them. Nobody reads them. It's just a situation where HUD is filling up warehouses full of audited financial reports that nobody ever cares about, and that simply is not the case. These audited financial reports are critical, and I think the ALJ decision reflects that, that this is really the only meaningful mechanism whereby HUD can monitor the financial viability of a particular HUD-subsidized housing complex to determine where the money is going, what money is coming in, what money is going out, are there adequate financial reserves in place that are required by HUD to pay for repairs and maintenance for a large apartment complex, are tenants' deposits being properly accounted for, is the entire project being managed in a way that conforms with generally acceptable accounting principles? Should it affect the amount of the penalty if none of those dangers actually occurred in this case? Yes, Your Honor, because HUD couldn't possibly know in 1997 and 98 and 99 and 2000 and 2001 that Mr. Yativ or Trime would pay off the loan in whole in late 2002. The focus is on what is the situation right now. At one point he tendered payment. Correct. Earlier. But during the process when the loan guarantee is in place and when HUD is financially exposed to that financial harm, that potential harm, HUD has a reasonable expectation that it will be able to monitor its risk, and it does that by evaluating these audited financial reports, which, by the way, these are not submitted in paper form. They're done on a website where fields are filled in by the accountant and then they are identified as certified by the accountant. And so that presentation of that audited financial report that's submitted online can be mined by HUD auditors in a very quick, rapid manner so that they can evaluate, is there a problem here? Do we need to further evaluate the financial health of this particular project? Is there a problem that we need to investigate further? Or do we give this one a pass for this year and then look at it again next year? That is an ongoing process from year to year to year, because during those years when that loan guarantee is in place, HUD is exposed to a financial risk to its insurance fund. The fact that the loan is paid off and the loan guarantee becomes meaningless years later doesn't mean that, in retrospect, the audited reports were of no value. So at the time of the risk, the time that the risk was real, those reports are important to HUD's ongoing monitoring progress of the apartment complex and to the tenants who live there. One of the purposes for HUD's existence is to encourage the development and availability of moderate and low-income housing to real people, real tenants. And part of that is to be able to encourage the availability of suitable housing, housing that meets the tenants' needs. And that includes maintenance costs, repair costs, to make sure that everything is being maintained in a reasonable way for the benefit of the tenants that HUD serves. And to his credit, Yativ's housing complex was maintained well. Sure, there were some problems here, problems there, but overall it was a well-maintained project. But the point here is that HUD has no way of knowing that unless these reports are provided on a timely basis so that on an annual basis HUD can very quickly evaluate in a summary fashion whether there's a problem that merits further review. And that's why those reports are important. Would you reply to Mr. Yativ's argument that the materiality standard is either an unconstitutional factor or completely illogical factors? The statute identifies a multitude of factors that the ALJ is obliged to consider or encouraged to consider in determining, A, whether a penalty should be assessed, and the amount of the penalty. All right. Just as to whether it should be in effect. Well, it conflates the two, unfortunately. The statute talks about it. Oh, I know. But you've got the problem of dealing with that. I don't think it's a problem at all. Is one factor unconstitutional? No. None of the factors are unconstitutional. All right. Because one of the factors, in generic terms, is the deterrence value of the penalty that's being proposed. And clearly the deterrence factor has built within it the individual's or the corporation's ability to pay. A very wealthy participant in this HUD program would not be in any way deterred by a low-value penalty. By the way, there is a maximum penalty, of course, for a violation. It seems to me to go to the penalty rather than the materiality. Well, the materiality issue focuses on the link between the penalty that's being imposed and the purposes for the underlying violation. And in this case, the annual report, what is the purpose of that report? And does the penalty have some meaning, some linkage between penalties? To go back to the penalty. The failure to file the report has no relation to whether the people can pay a fine or not or whether a fine will deter them. Well, I think it does. How does that happen? Because it costs money to have a certified public accountant prepare these reports and certify them and submit them. That has a fixed cost or at least a definable cost. And so a HUD participant such as Yativ can decide, well, it's going to cost me X dollars, using hypothetical numbers, $5,000 a year to submit this report, but I'm only going to get hit with a $2,000 penalty if I don't, so I'll go ahead and just take the penalty and I won't submit the report. And so there is a rational linkage for purposes of the deterrence value in terms of what kind of penalty is imposed, first of all, whether a penalty at all is imposed, and secondly, what the amount of that penalty should be. What about the other factors he said were illogical? I don't think that any of them are illogical. Some of them may not apply to the particular violation. There's a multitude of violations, or I should say obligations, that are imposed upon a HUD-insured mortgagor. There's about a dozen. And then there are penalties that can be assessed based on violating those obligations. And then there are factors to consider to determine whether a penalty should be imposed. Clearly, some of those factors don't relate to particular violations. But that doesn't mean the entire scheme fails. It simply means that you look at the factors that are germane and relevant to the actual violation that is being evaluated. What were the most germane here? The most germane here? First of all, the gravity of the offense. And by that I mean how does this affect HUD's performance of its programmatic obligations in evaluating the viability of these projects and its financial risk? The history of other offenses, and here by the time 2001 rolls around, we have four years of sequential violations that have occurred. We have the ability to pay that we've already talked about. We have the benefit that's received by Yativ in not complying with the obligations. Namely, he saved the money that he would have had to pay somebody else to submit the required reports. And so he enjoyed that benefit after already obtaining the benefit of the HUD guarantee itself. And then there's the deterrence value of it's a fairly small community of HUD-insured mortgagors nationwide. The message needs to be sent that HUD cares about these audited financial reports. It's not simply a meaningless exercise. Am I right in understanding that HUD did not ask for them for four years? Well, I think Judge Canby focused on that briefly. There was a point of contention during the ALJ proceedings. Well, did they or did they not? There was testimony presented that HUD requested from time to time the reports during 1997 through 2001. And who testified to that? I don't recall the name, but in footnote number four in the ALJ decision at page 74 of the excerpts of record, I believe the person was named there, but I just don't remember her name. And was that testimony undisputed, is that right? No, it wasn't. It was not disputed. Mr. Yateev testified that there was no such communication. There was no such demands for the reports. But that same footnote — And the ALJ didn't make a finding on that. That is correct. It just noted that there was a — No, it's very hard. If that's up in the air, it's hard to see that these were important to HUD. If you don't know whether they asked them or not, and it's disputed, and the ALJ doesn't find that the testimony of the HUD official is credible, it's not substantiated in the record that this was important to HUD. But the ALJ didn't make that finding that it wasn't credible. No, he didn't make it the other way, though. He didn't find that they were asked for it. That's correct, because the ALJ found that it wasn't important to the ALJ determination about the appointments. As to what was material, it was not important to find out whether HUD really was interested in them? Well, of course, materiality was important as a generic — And the fact that a government agency goes four years and doesn't ask for them is not material? I think that's important. But what the ALJ specifically did find in that footnote is that HUD was not indifferent to the submission of these reports. That was what the ALJ found. What did that mean? Well, it means that HUD cared about these reports. HUD cared, but did they care in the four years? We don't know. That's correct. The ALJ did not make that finding, but did make the finding, and not only in that footnote, but in the text of both decisions, the ALJ went through in some detail about why these reports are important and why the failure to provide these reports on an ongoing basis, on an annual basis, undermines the ability of HUD to do its job. And that is to protect tenants, preserve and protect its own insurance fund, and to hold people accountable for what they have promised to do in seeking out and obtaining the loan guarantee that HUD provides as part of that financing of the apartment complex. And so the materiality issue, I believe, was properly found, although there was a point of contention about the extent to which HUD demanded the reports through the years. That particular factual point did not need to be resolved in the ALJ's view, because the ALJ had an adequate factual basis to find that HUD was not indifferent to these reports. And, Your Honor, even as late as 2001, when there was a flurry of letters that are part of the administrative record, even at that late date, Mr. Yateev is saying, I'm not going to give you these reports. In fact, I never intended to give you these reports. I didn't think you would ever enforce these reports. I thought this was a meaningless exercise. My private mortgage broker told me that you didn't enforce this. But even at that late date, if he had simply provided the delinquent reports, we don't know for certain what HUD's response would have been, but looking at the letters that went back and forth, it would appear as though HUD would have said, thank you for finally providing not only the delinquent reports, but by the way, you have another report due in a few months. Will you please provide that one too? But Mr. Yateev simply said, no, you don't need these reports. I don't need to give them to you, and I'm not going to, and I never intended to, which, of course, goes directly to the issue of knowing violation. He clearly knew what the obligation was. At the time he said that, had the loan been paid off? No. The loan was not paid off until December of 2002. And we see a number of the letters are quoted in the ALJ decision. They're in mid-2001 and early 2002 when the issue was more aggressively discussed between HUD and Mr. Yateev about where are these reports that we've been talking about for so long. So the later payoff, which was, I believe, the last day of December of 2002, was not part of that dynamic of where are the reports. Here, Your Honor, the ultimate decision or the ultimate determination before the court is, is there a factual, a reasonable factual basis within the record to support the ALJ's decision? And there is. Mr. Yateev had no intention, either on behalf of TRIME, the corporate entity, or individually of ever providing the reports which he promised to provide, which he agreed to provide in the regulatory agreement and which, by statute, was required to be provided. The reply brief, I think, suggests that the main focus here, on behalf of Mr. Yateev, is this notion that the regulatory agreement is the sole basis for any kind of enforcement action by HUD, and clearly that is simply not the case, that the statute describes what the violations are, describes what the obligations are, describes what the penalties are that are available to HUD to enforce the obligations that are imposed, and the statute is a separate mechanism that's available. HUD does not need to declare a default and foreclose on the mortgage in order to vindicate its expectation that people will comply with their statutory obligations, and one of those obligations is to provide these end reports. Clearly, that was a contractual obligation as well, but it was also a statutory obligation. The regulatory agreement says provide reports as required by the secretary or something like that? It says that the audited financial reports will be provided, and then it says that upon the request of the secretary, they will be audited by a certified public accountant, and so there is that provision in the regulatory agreement that the report needs to be certified. The statute says it's required. If the secretary requires it, then I assume you're saying that the secretary's request came in the form of a regulation. That's correct. But even putting that aside, the statute itself says these reports must be certified by a certified public accountant or independent public accountant, and that is what the penalty was based on, was the violation of the statute. Thank you, counsel. I would just like to call the Court's attention to something that pervades both the ALJ's opinion and their brief. Much of what, and with all due respect, an esteemed member of the Bar, one who appears before this Court regularly, with due respect to Mr. Addington, much of what he said is either not in the record or flatly contradicted by the record. Did you write hard that you never intended to file the reports? On the contrary, Your Honor. The only proof which was credited by the ALJ was I received a letter on February 5, 2001. On the day that I received the letter, I called Joyce Young, the name that Mr. Addington was unable to recall, and said, you know, Ms. Young, I'm happy to provide these reports to you. It was my understanding that HUD doesn't care about them. You've never asked for them before, but I'm happy to provide them to you. In fact, I have them right here because I used my Quicken program to prepare my tax returns. I had them. And she said, no, they have to be audited. And I said, no, ma'am. 9E of the regulatory agreement. I mean, you may fault me for being a stickler for details, but you're not going to fault me, I don't think, for not doing my duty. I said, ma'am, Clause 9E says that only unaudited reports are required. And that's what I'm offering you. She says, no, you have to give me audited reports. And I said, why? And she basically said, and I know your honors have had experience enough with the government to believe this answer, because I said so. That was her answer. She didn't say because there's a statute that HUD created after you entered into this agreement or Tri-Me Corporation entered into this agreement. She didn't say that. She just said because I said so. I agree with you, Mr. Rose. Experience with the bureaucracy is all too current. But, I mean, rather than get into this detail, which I think is a critical one, I really want to make a bigger point to your honors, and the bigger point is please, as you're writing your opinions, please look to the record, because you will not find most of the things you've just heard about. Let me give you a couple of examples. Well, the example you just gave, I believe your opponent said, you know, he hasn't, he said he's not going to submit these reports, and the answer, he's referring to audited reports. That's correct. And you clearly weren't going to give them audited. Hold on a second, your honor. No, I didn't say that. What I said was, I read the agreement. Look, no party to an agreement is obligated to take the other party's understanding of the agreement. I mean, if you and I enter into a contract, I'm going to buy a car from you for $1,000, and you say, hey, I want $1,500. I mean, come on. The point is, I will live up to the agreement I was obligated to live under. And when I say I, I really mean Trimie Corporation. I don't mean Jack Hattie. He was not obligated on this in any way, shape, or form. But the point is that I asked the government to tell me why it was that I was obligated to do this. If Joyce Young had, in a conversation, said to me, hey, you know what, you owe us $50,000. And I said, ma'am, it's not in the regulatory agreement. She says, well, you know, we just passed a regulation. You owe me $50,000. Your Honor would be correct if you're reading me to say, no way. I'm not going to pay you $50,000. It's not in there. The regulatory agreement was clear. Clause 15 in the regulatory agreement was clear that it superseded any provision in conflict therewith. And I was not going to take the word of Joyce Young saying, hey, you have to do this. Now, let me just close, and I only have a couple minutes. A couple more examples. Judge Noonan asked Mr. Addington, give us some of the serious violations here. The first one that he mentioned was the gravity of the offense. The way that the judge in this case described that is he said, well, to try to determine materiality by gravity begs the question. It's like asking, is this serious, by asking if it's serious. The second thing he said was history of offenses. The reason I didn't quote what he said on gravity is because it's a long paragraph. But history of offenses was the second thing Mr. Addington said. Well, let me quote page 53 of the record. This is what the ALJ in this case said. The record contains no evidence that respondents have previously violated the act. Okay? So he was just telling you here, and I just am asking your honors to realize that, that he's given you a lot of misinformation. Not intentionally. I don't suggest that. It's a big record, and it's a record that I've personally lived in that I'm very familiar with. But he is incorrect about that. Factor number, the ability to pay issue. He kept mixing up, as I understand why it's easy to do so, because HUD, again, not in compliance with a congressional statute, has mixed the two sets of factors by using them both to determine materiality and to determine damages or the amount of penalty. I agree with Judge Noonan that the ability to pay is, and your honor, Judge Camby, that it is appropriate to look at the ability to pay in determining the amount of the penalty. But that isn't my gripe here. My gripe is that they used ability to pay to determine liability. And let me just read to you. You're out of time. In fact, you're out of time, Mr. Yativ. Okay. Thank you. Thank you. The matter will be submitted.  Thank you. This part of the discussion is being adjourned. Thank you. Thank you.
judges: Canby, Noonan, Paez